# JOHN H. STROGER, JR. HOSPITAL OF COOK COUNTY

Toni Preckwinkle • President
Cook County Board of Commissioners

Warren L. Batts • Chairman
Cook County Health & Hospitals System

Jorge Ramirez • Vice-Chairman
Cook County Health & Hospitals System

Ram Raju MD, MBA, FACS, FACHE • CEO
Cook County Health & Hospitals System

Carol Schneider • COO
Cook County Health & Hospitals System
John H. Stroger, Jr. Hospital of Cook County



COOK COUNTY HEALTH & HOSPITALS SYSTEM
CCHHS

Health & Hospitals System Board M
Dr. David A. Ansell
Commissioner Jerry Butler
David N. Carvalho
Quin R. Golden
Benn Greenspan
Sr. Sheila Lyne
Dr. Luis R. Muñoz
Heather E. O'Donnell
Ruth M. Rothstein

10/14/13

Dear Mr. Johnson,

This report serves as written summary of my review of the available records in the *Taylor v. Brown County et al* case.

I am double-boarded in both Infectious Diseases and Internal Medicine. I completed my medical residency training at the University of Pittsburgh Medical Center in 2002. I completed my fellowship specialty training in Infectious Diseases at Rush University in Chicago in 2004. Since then, I have been a full-time practicing Infectious Diseases attending physician at the Cook County Jail in Chicago, with additional privileges at the John H. Stroger Hospital and the Ruth M. Rothstein CORE Center. I am also a voluntary Clinical Assistant Professor of Family Medicine at the University of Illinois School of Medicine and a Certified Correctional Healthcare Provider.

The Cook County Jail is one of the largest single site urban correctional facilities in the United States, with a capacity of approximately 9,000 detainees. Our daily census varies from 8,000 to 11,000 detainees. In addition to my primary duties as the on-site infectious diseases specialist, I have also worked in every unit on the compound including all men's and women's general population (all security levels including maximum), infirmary units, mental health units, emergency room, intake


EXHIBIT 9

facility, specialty clinic areas, and the women's day reporting program. I have experience with nearly every aspect of jail healthcare from frontline clinical duties to Director of the Infection Control Department to development of policies and procedures. I also act as faculty for the Department of Corrections Sheriff's Academy training on a weekly basis and am familiar with many of the interagency policies and procedures. As the Director of Infection Control, I am responsible for maintaining and updating facility policies on contagious diseases including containment in outbreaks, clinical management of select infections, reporting to health agencies, sanitation and environmental hygiene. I am also a co-principal investigator or otherwise responsible for multiple research protocols and service grants. Additionally, I am the primary liaison between the Cook County Jail and various public health agencies including the Chicago Department of Public Health and Illinois Department of Public Health.

At the Ruth M. Rothstein CORE Center I act as the director of the Continuity of Care clinic for HIV+ returning citizens. Our facility serves over 6,000 under or uninsured members of the Cook County community. My clinic is exclusively for those HIV+ men and women recently released from either the Cook County Jail or from any of the Illinois Department of Corrections facilities statewide.

At the John H. Stroger Hospital I rotate twice yearly for two weeks each service block as one of the HIV inpatient ward attending physicians. I supervise a team of 2 residents, 2 interns, 1 physicians' assistant, and a clinical pharmacist. In this setting we care for patients with a variety of conditions requiring hospitalization including infectious diseases, other chronic medical conditions, cancer, cardiac care, diabetes, lung disease,

2

autoimmune disorders, mental health issues, homelessness, dementia, neurologic conditions, skin problems, substance abuse/withdrawal and more.

Please refer to the attached CV for a listing of professional publications and presentations over the previous ten years.

I have testified as an expert witness for the defense in a deposition multiple times in the previous four years (USDC Southern District of FL, 07-61296, USDC Northern District of TX, 3:11-CV-0527K, USDC Eastern District of MI, 11-cv-10942, USDC Western District of MI, Southern Division, 4:92-CV-110) . I have testified at trial twice in the past four years: 3:11-CV-0527K and 4:92-CV-110.

I am being compensated for this case at a rate of $350.00/hr. for review of records, report generation, and portal-to-portal travel time. In the event of deposition, I will be compensated at a rate of $500.00/hr plus travel time and related expenses. In the event of trial testimony, I will be compensated at a rate of $4000.00/day plus travel time and related expenses.

I have reviewed the documents related to the above-referenced litigation with regards to the allegations and issues alleged in the Plaintiffs' complaint and the opinions stated in the Plaintiffs' expert witnesses' reports.

    A. Amended Complaint

    B. Brown County Jail Medical Records

    C. Brown County Jail Booking Records

    D. St. Vincent Hospital Medical Records

    E. Correctional Healthcare Companies Medical Records

    F. Photos of Leg Wounds

3

G. Various Interrogatories/Responses

H. Brown County Sheriff's Department Policy and Procedure Manual

I. Taylor Medical Bills

J. Klarkowski Deposition

K. Gary Peterson Expert Opinion Letter

L. Charles Saletta, MD Opinion Letter

M. Steffen Deposition

N. Mitchell Deposition

O. Molitor Deposition

P. Jasmer Deposition

Q. Voster Deposition

R. Malcomson Deposition

**Relevant History:** Mr. Mark Taylor was a then 40-year-old male who was detained during the spring and summer of 2011 at the Brown County Correctional (Huber) Facility. He had no significant known past medical history. The timeline relevant to the issues outlined in the Amended Complaint begins on or around July 16, 2011.

According to the Amended Complaint, Mr. Taylor noticed a "small bump" on the back of his right leg. The complaint states he informed an officer (not named) about the bump. However, it should be noted that this is not the correct or appropriate method for an inmate to request a healthcare evaluation excepting for emergencies. A "small bump" could not reasonably be considered a true medical emergency at that time, and Mr. Taylor should have completed a health service request form, which are available in the living units

4

at Huber or can be provided by the on-duty officers. Because he did not report this non-emergent complaint to anyone via the approved and appropriate channel, this led to an initial delay in Mr. Taylor being evaluated through no fault or deviation of policy or procedures by any Brown County staff. Further, it is unreasonable and unfair to expect a correctional officer to personally assess such a complaint and to be able to make a decision as to if the complaint represented a true emergency. This is beyond their level of training, and according to the Brown County Sheriff's Department Policy and Procedures Manual (H1C addendum and H4), would have fallen under a "non-emergent" medical condition (closed wound/open wound/signs of infection). Non-emergent medical conditions can be deferred to the health services unit. Access to the health services unit is solicited by completing a request form, not by notifying an officer of a non-emergent medical condition.

According to the complaint, by July 18th, 2011, this "small bump" had progressed to a "very large boil" that was hot and painful to touch. Mr. Taylor came to the conclusion that this represented an infection. According to the complaint, Mr. Taylor again informed an officer (not named) who again correctly redirected Mr. Taylor to complete a written request for a medical evaluation. While this boil was undoubtedly painful, given Mr. Taylor's lack of medical training, neither he nor any Brown County correctional officer could make a determination as to whether his condition at that time represented something that would require an emergent evaluation or hospitalization. Should a nurse or MD have seen this boil on July 18th, based on the description provided in the Amended Complaint, I do not believe Mr. Taylor would have been sent to an emergency room or hospital for an evaluation. Boils are a relatively routine and simple medical problem that typically can be easily managed in almost any basic healthcare setting including a nurses'

5

station or primary care office. The unnamed officer appropriately informed Mr. Taylor that he would receive a medical evaluation at the Health Services Unit (HSU) at their next available appointment. It is also unreasonable for any officer, nurse, or even MD to be able to predict at this time that this boil would progress rapidly in size and significance over the next 2 days. Mr. Taylor completed and submitted this written request as instructed, but after the time the sick call requests for July 18th had already been collected. It was collected the next morning (July 19th, 2011) and sent to a nurse for triage. It is very typical and consistent with correctional healthcare standards to collect sick call requests once daily, so the fact that Mr. Taylor's request was not seen by a nurse until July 19th is well within expected jail standards. Mr. Taylor was scheduled for the next available appointment with a nurse, which was the following day (July 20th, 2011). To this point in time, I do not see any evidence of failure to respond to Mr. Taylor's medical needs, nor deviation from the Brown County Sheriff's Policy Manual.

On July 20, 2011, nurse Nellis in the HSU saw Mr. Taylor at approximately 11:15 a.m. It should be noted this was exactly one day after nurse Klarkowski reviewed Mr. Taylor's first request (received by her on July 19th). This represents a very quick turnaround between receipt of the complaint and an in-person evaluation. The Amended Complaint alleges that this nurse did not remove the bandage to evaluate the boil. However, review of the actual medical documentation clearly shows the nurse must have removed the dressing. There is a clear description of the wound and surrounding tissue, described as "large boil approx. 2" diameter on back of R leg, entire thigh (back), reddened, doesn't blanch." Not only does this clearly describe a visual inspection, it indicates the nurse actually touched the affected area (noting the skin did not blanch).

6

The complaint next claims the nurse prescribed Mr. Taylor antibiotics and ibuprofen in an attempt to "clear up the infection." This is incorrect. Nurses do not have prescribing privileges. They must consult with a medical provider who has prescribing powers such as an MD or mid-level provider. There is clear evidence from the medical documentation that this nurse did in fact escalate her concerns to an MD, who provided a telephone order for the Keflex (antibiotic) and pain medication. Based on this nurse's assessment, she determined the skin infection was significant enough to warrant personal communication with a doctor, and solicited a prescription for an antibiotic. As Mr. Taylor was otherwise stable (low grade temperature, otherwise unremarkable vital signs), there was no indication at that time a transfer to an emergency room or hospital was warranted. Lastly, Keflex is a reasonable first line choice for management of a soft tissue infection such as cellulitis. Only in hindsight do we know this infection was caused by CA-MRSA, a bacteria that would not respond to this treatment. There was no way a nurse, mid-level, or MD could have known the etiology of this infection at that time. Even if a wound culture had been acquired, the result would not have been available for at least 2 to 3 days later. At this point, I see no deviation from any reasonable standard of care to Mr. Taylor's medical needs.

The Amended Complaint next states that the following day, July 21, 2011, Mr. Taylor submitted another request to be evaluated at the HSU because his leg condition was progressing despite initial attempted management with Keflex. This second health service request does not have a time documented, so it is impossible to know precisely when Mr. Taylor actually submitted it. One can only speculate it was early enough in the morning to be collected with that day's other sick call requests. In nurse Klarkowski's deposition, she

7

also does not identify what time she reviewed his second request, so it is impossible to determine how much time elapsed between Mr. Taylor's request and the time he was actually seen at 6pm later on the same day, July 21, 2011.

Based on the MAR (medical administration record) Mr. Taylor had only received his first dose of the antibiotic. When the health request was received by nurse Klarkowski (also with no documented time of this review), she appropriately reviewed the recent medical documentation from the day prior, noted that Mr. Taylor had just had an evaluation a day earlier and made a reasonable clinical judgment that the infection may have required more time on treatment before a meaningful response would have occurred. In hindsight it is easy to fault the nurse because we now know this infection was caused by CA-MRSA and not simply a susceptible staphylococcus infection. At the time, however, the cause of the skin infection was unknown and could not possibly have been predicted by this nurse or another medical provider. She acted on the information available to her and made a reasonable clinical decision that only in hindsight do we know was questionable. This nurse was not indifferent to Mr. Taylor's needs, but rather, made what she felt was a sound judgment call based on the information available to her.

The Amended Complaint then states that Mr. Taylor showed his leg to "several officers" (not named), and claims one of the officers (not named) thought the leg looked "very bad." Despite what Mr. Taylor claims to be severe and excruciating pain, he was somehow still able to go to his day job in the kitchen area. The complaint that alleges that various officers and Mr. Taylor's kitchen supervisor all showed concern for his leg but failed to notify the HSU. As noted above, while Mr. Taylor's leg had progressed significantly over the preceding 72 hours, there was no way any of the officers or his kitchen supervisor

8

could have known how it looked over the prior days to see such progression, nor were they qualified to determine if his infection warranted any emergent medical attention. According to the Sheriff's Policy manual, recommending a written request for a medical evaluation was within the scope of their training and was followed appropriately.

The Amended Complaint next states that in the "evening" of July 21, 2011, that Mr. Taylor pushed the "ER" button to solicit an urgent evaluation. This time would have been prior to 6pm on July 21, 2011 based on the available medical documentation, and only hours after nurse Klarkowski had previously reviewed his written request for another assessment. At this 6pm evaluation, the nurse examined Mr. Taylor's leg, noting a "large sore 3" in diameter. Beefy red with areas of black. Inmate states bleeding and drainage present. Red area extends outside of sore extending to just beneath buttocks and down to back of knee. Area hot to touch and without blanching." She *immediately* recognized this infection was significantly worse than one day prior, and *immediately* arranged for a transfer to the St. Vincent emergency room for evaluation and management. While the complaint attempts to paint a picture of a lengthy, drawn out failure to address Mr. Taylor's needs, the facts show that no more than a handful of hours passed between nurse Klarkowski making her clinical judgment and the second nurse sending him to an outside medical facility. Her response was immediate and appropriate and shows no evidence of deviation of any standards of medical care to Mr. Taylor's medical needs. Further, based on the description of the infection from both Mr. Taylor and the nurses, it is my opinion that had he been sent to St. Vincent earlier that same day, it would have made no clinical difference whatsoever to his management. I believe he would have required drainage and surgical debridement regardless of a morning or afternoon evaluation.

9

At St. Vincent, Mr. Taylor underwent a surgical debridement of the abscess and was prescribed oral antibiotics and pain medication. According to the St. Vincent medical records, Mr. Taylor's condition rapidly improved and he was able to be transferred back to Huber to continue routine wound care and to complete a short course of oral doxycycline (antibiotic). He returned on July 25th, 2011. Subsequent medical documentation over the following couple of weeks show Mr. Taylor had significant and substantial improvement in his wound as well as complete resolution of the associated cellulitis. Subsequent documentation from Huber shows Mr. Taylor received regular wound care and had no complaints of pain within approximately two weeks after this surgery.

The Amended Complaint next states that due to this infection, Mr. Taylor "suffered permanent injuries including loss of feeling in an area of his leg" (which is not specified). There are further claims of past and future suffering and disability. However, upon review of additional medical records from subsequent visits to St. Vincent, these complaints of permanent and ongoing disability and suffering are conspicuously absent. There is a visit dated May 8th, 2012 where he was evaluated for neck pain after a motor vehicle accident. There is no mention whatsoever of any alleged right-leg-associated issues or concerns. In the assessment documented by PA Jac A. Clement, Mr. Taylor described some right-sided neck tenderness from the vehicular accident, but "no other complaints" and that Mr. Taylor was "ambulatory" (meaning he was able to walk without assistance). For a man who claims to have permanent nerve damage to the point of disability, it is not mentioned by Mr. Taylor.

There is a second St. Vincent emergency room evaluation dated June 2, 2012. Mr. Taylor presented with a cough for 10 days. A complete review of systems was taken by

10

Erin Green, MD, and again there were "no other complaints". Conspicuously absent again were any complaints of any kind related to his right leg, nerve damage, or other signs or symptoms suggesting permanent disability.

There is a third St. Vincent emergency room evaluation dated June 18, 2012. At this visit, Mr. Taylor presented with arm pain. Especially important to note is that the initial assessment documents this pain occurred *"in the course of his job"*. For a man claiming permanent suffering and disability, he was able to maintain employment less than one year after his skin infection. Again conspicuously absent from this evaluation by Thomas Pannke, MD, are any complaints of any kind whatsoever about disabling pain or any other concerns regarding his prior infection.

Finally, in the opinion letter provided by Dr. Saletta (the surgeon who performed the debridement of Mr. Taylor's abscess), he notes that Mr. Taylor did not keep his follow up evaluations in his clinic. For a man with such an ongoing, disabling, permanent concerns related to his leg infection, it is peculiar that he did not feel follow up with the doctor most familiar with his case was necessary.

In my opinion, based on the available clinical documentation, I believe there is likely a fairly large scar at the site of surgical debridement, located in an area that is most likely typically covered by clothing most of the time. Scars are not 'normal' skin tissue, and typically have minimal sensation. However, this is hardly disabling. At most it might be a nuisance but I believe it is a gross mischaracterization to call it a disability.

As an experienced jail correctional healthcare provider, I can attest that the procedures followed by the Huber correctional officers are fairly standard and consistent with practices in the Cook County Jail. Under the auspices of the US Department of Justice,

11

we have developed an interagency agreement between the medical unit and the department of corrections. This agreement includes annual medical training provided by members of the healthcare unit including myself. At this training, we inform the officers of their duties in the context of medical complaints and emergency care. We train the officers to recognize which complaints are 'routine' (meaning the officer redirects the inmate to complete a health services request form) versus urgent/emergent (meaning the officer does not delay access to the healthcare unit). A "small bump" or even a painful boil would generally not fall outside what would be considered routine. Had one of our officers seen Mr. Taylor on July 16 or July 18, I believe they would have done exactly as the Huber officers did and recommended he complete a heath service request form. On July 21st, given the extent of the infection based on the provided descriptions, one can only speculate whether or not an officer would assess his complaint as one that warranted escalation beyond filling out a sick call request. Given that this type of clinical assessment is outside the scope of any correctional officer's training or policies, it would simply be a judgment call and likely would vary from officer to officer in any correctional facility.

I have visited many jails and prisons around the country. It is typical that health service request forms are collected once daily (in select units they may be collected more frequently). These forms are then triaged by nursing or other medical staff for acuity as well as duplication. In my experience, inmates frequently fill out request forms numerous times for the same complaint, adding time and work to the triage staff. Adding to the challenge is that not every inmate is able to clearly document the nature and severity of their complaint in a standardized way. This means it is usually up to the triage nurse to make a determination as to which complaints warrant prioritization over others. This is

not a simple task, and occasionally relies on the experience of the nurse reviewing the complaints. Once a determination is made that an in-person medical evaluation should occur, it is typical for a 'routine' evaluation to take up to a week to be seen. Given Mr. Taylor's initial complain of a bump/boil, this would likely have fallen into the routine category. In our jail he may have waited a full week before being seen in person. At Huber he was seen within 2 days of his request (and within one day of the request actually being seen by a nurse). In my experience and opinion, this is actually a fairly rapid response time for a routine request.

It is understandable why Mr. Taylor approached officers as his initial attempt to access healthcare. After all, the officers are the staff members with whom he had the most direct daily contact. However, this does not mean the officers are therefore responsible for any/every medical complaint brought to their attention. They are trained to respond to true emergencies (such as a cardiac arrest, seizure, or asthma attack) and to defer medical management to the HSU for other types of medical needs. Based on the review of the available documentation, I believe the Brown County officers followed their training and policies correctly and did not deviate from healthcare standards in the context of their duties as corrections officers.

I reserve the right to amend this opinion letter should additional information become available and furnished for my review.

Respectfully submitted,

Chad Zawitz, MD

13