UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARK G. TAYLOR,

    Plaintiff,

  v.            Case No. 13-C-038

LARRY MALCOLMSON, et al.,

    Defendants.

## DECISION AND ORDER GRANTING
## MOTIONS FOR SUMMARY JUDGMENT

    Plaintiff Mark G. Taylor, a former inmate in the Brown County Jail's Work Release Center (WRC), filed this § 1983 civil rights action on January 11, 2013, alleging that WRC officers and Health Professionals, Ltd. (HPL), the company that provided health care services for inmates under a contract with Brown County, violated his constitutional rights during his confinement at the WRC in July of 2011. More specifically, Taylor alleges that the WRC officers and HPL were deliberately indifferent to his serious medical needs and, as a result, unreasonably delayed diagnosing and treating him for Methicillin-resistant Staphylococcus aureus (MRSA), a serious skin infection he contracted at the WRC. Taylor claims that the defendants' actions or omissions violated his rights under the Eighth and Fourteenth Amendments. Alternatively, Taylor claims that the defendants were negligent in failing to promptly diagnose and treat his condition. Taylor's Second Amended Complaint, which was filed on October 29, 2013 (ECF No. 55), names as defendants HPL and seven officers at the WRC (collectively "the Brown County Defendants"). The Brown County Defendants are Captain Larry Malcolmson, Corrections Officer (C.O.) Emily Molitor, Corporal

Nick Dequaine, Corporal Alan Krings, C.O. Jennifer Wotachek, C.O. NT Xiong, and Corporal Paul. The Second Amended Complaint also names Wisconsin Mutual Insurance Company, the liability insurer for Brown County. The case is before the Court on motions for summary judgment by all of the defendants. (ECF Nos. 62, 66.) For the reasons that follow, the defendants' motions will be granted as to the federal claims and the state law claims will be dismissed without prejudice so that they can be pursued in state court.

## FACTUAL BACKGROUND

The background facts in this case are largely undisputed. It is over the inferences that can be drawn from those facts that the parties' dispute lies. On July 16, 2011, while serving a sentence at the WRC, Taylor first noticed a small bump—the parties also describe it as a pimple, boil, and wound in various filings—during the afternoon or evening. (Pl. Prop. Undisputed Facts (PPUF) ¶ 1, ECF No. 77.) Taylor did not fill out a medical request form that day. (Brown Cnty. Prop. Undisputed Facts (BC PUF) ¶ 44, ECF No. 64.) Although the bump was slightly bigger the next day, Taylor did not fill out a medical request form on July 17. (*Id.* ¶¶ 46, 49.) Taylor worked his scheduled shifts in the kitchen on both days. (Health Professionals Ltd. Prop. Undisputed Facts (HPL PUF) ¶ 45, ECF No. 67.) His shifts were from 10:00am to 12:00pm and 3:00pm to 5:00pm every day. (*Id.* ¶ 38.)

After his first shift of work in the kitchen on July 18, Taylor noticed fluid starting to discharge from the center of the bump. (PPUF ¶ 3, ECF No. 77.) It had also increased in size, height, and hardness. (*Id.*) Because his condition had not improved, Taylor submitted a medical request on the afternoon of July 18. (*Id.* ¶ 7.) The request read as follows: "I have a very red and

painful bump on the back of my right leg. It hurts and has not gotten any better in 3 days." (*Id.*) Taylor did not mention any leaking or discharge in the request. (BC PUF ¶ 57, ECF No. 64.) After working his second shift on July 18, Taylor claims he showed Corporal Krings the back of his leg and asked to be allowed to walk to the emergency room. (*Id.* ¶ 61.) Corporal Krings directed Taylor to submit a medical request to receive medical care. (*Id.* ¶ 63.)

Taylor's medical request was routed to HPL staff because, at the time, health care was provided to WRC inmates by nurses and doctors from HPL. (*Id.* ¶ 1.) Correctional officers at the WRC collected medical requests from inmates and placed them in a mailbox. (*Id.* ¶ 2.) A member of the HPL nursing staff picked up the requests each weekday morning after sick call. (HPL PUF ¶ 28, ECF No. 67.) A member of the HPL staff then reviewed the requests. (BC PUF ¶ 2, ECF No. 64.) Corporals at the WRC also triaged medical requests in some situations to determine if there was an urgent medical issue. (BC PUF ¶ 5, ECF No. 64.) There is no evidence in the record establishing whether Corporals Krings, Dequaine, or Donarski reviewed Taylor's July 18 request. The corrections officers and corporals were generally not allowed to review medical progress notes due to state and federal privacy laws. (*Id.* ¶ 3.) They would only learn information from the medical progress notes if the information was necessary for the care of the inmate. (*Id.* ¶ 4.)

On July 19, HPL Nurse Roxanne Klarkowski, who was in charge of the Health Services Unit at the WRC, reviewed Taylor's request. (HPL PUF ¶¶ 30, 53, ECF No. 67.) She determined that Taylor would be seen at the "next available appointment with a nurse," which was July 20. (*Id.* ¶ 53.) Taylor does not recall making any complaints to any of the Brown County Defendants or HPL staff on July 19. (*Id.* ¶ 55.) He also worked both of his shifts in the kitchen on July 19. (*Id.* ¶ 56.)

Around 11:15am on July 20, Nurse Maureen Nellis, a member of the HPL staff, conducted an assessment of Taylor. (*Id.* ¶ 57.) She reviewed his medical request and measured his vital signs, which were essentially at his baseline levels compared to his initial health assessment. (*Id.* ¶¶ 58–59.) Although Taylor contends she never even looked at his wound, Nurse Nellis entered the following progress note regarding her observations: "I/M presented with a large boil approximately 2 inches diameter on back of right leg. Entire thigh (back) reddened, doesn't blanch. I/M states it is painful and despite high heat feels chilled." (*Id.* ¶ 60.) Based on Nurse Nellis' findings, Dr. Jeffrey Allen, an HPL physician, prescribed 1000 milligrams of Keflex twice daily for 10 days and 800 milligrams of Ibuprofen twice daily for 10 days. (*Id.* ¶ 65.) Keflex is an antibiotic commonly used for skin infections and is considered a first line of treatment; ibuprofen is used to treat pain, inflammation, and signs of fever. (*Id.* ¶¶ 66–67.) In accordance with the prescriptions, Taylor received Keflex and Ibuprofen at 5:00pm on July 20 and at 5:00am and 5:00pm on July 21. (*Id.* ¶ 69.) Taylor also worked his scheduled shifts in the kitchen on July 20 and 21. (*Id.* ¶¶ 70, 82.)

Taylor later complained to C.O. Molitor about his skin infection, requesting additional bandages and permission to go to the hospital. (PPUF ¶ 18, ECF No. 77.) Though she was less than clear on the date or time, C.O. Molitor confirmed that at some point Taylor complained to her about his skin condition and showed her his wound sometime after he was seen by Nurse Nellis. C.O. Molitor, who worked second shift at the WRC, noticed that it looked like an open sore with a red ring around it. The wound had leaked through the bandage and his jail uniform, and Taylor was attempting to stop the flow with paper towel. C.O. Molitor thought it looked serious and relayed Taylor's request to go to the hospital to Corporal Donarski. Upon noting that Taylor had already

been seen by HSU that day, Corporal Donarski stated that he would need to complete another medical request. (*Id.* ¶¶ 28, 91.)

On July 21, 2011, Taylor submitted a second medical request that read as follows: "Could I please get my leg looked at. I'd feel better being able to walk to the ER. I am leaking blood, and have no bandages to contain the discharge. The pain is excruciating." (HPL PUF ¶¶ 71–72, ECF No. 67.) Nurse Klarkowski reviewed and denied his request the same day, noting that he had been seen by a nurse on July 20 and had just begun taking the antibiotic. (*Id.* ¶¶ 73–74.) Later that day, Taylor pushed the "ER button" in his cell to complain about his leg. (PPUF ¶ 21, ECF No. 77.) C.O. Xiong responded to Taylor and informed him that he should complete another medical request. (*Id.*)

Taylor also complained about his leg to C.O. Molitor sometime after she began her shift at on July 21, who informed Corporal Dequaine. (PPUF ¶¶ 30, 91, ECF No. 77.) He denied Taylor's request to go to the hospital. (*Id.*) Finally, shortly before 6:00pm on July 21, C.O. Molitor asked HPL Nurse Kelly DeGroot, who was seeing another inmate on the floor, if she would look at Taylor's leg. (HPL PUF ¶¶ 77–78, ECF No. 67; PPUF ¶¶ 31, 33, 37, ECF No. 77; BC PUF ¶ 77, ECF No. 64.) As part of her observations and assessment, Nurse DeGroot noted that Taylor had a large sore, which appeared beefy red with areas of black, that was approximately three inches in diameter. (HPL PUF ¶ 80, ECF No. 67.) The area was hot to the touch and did not blanch. (*Id.*) After consulting with Nurse Sandy Geister, the HPL triage nurse, by telephone, Nurse DeGroot authorized Taylor to go to the hospital emergency room. (*Id.* ¶ 81; PPUF ¶¶ 34, 81, ECF No. 77.)

Taylor was diagnosed with cellulitis and "presumed" MRSA and admitted to St. Vincent's Hospital. (HPL ¶ 83, ECF No. 67.) The next day, Dr. Charles Saletta, MD, a general surgeon, saw

Taylor and performed a surgical procedure that included an incision and drainage, as well as a debridement of Taylor's right leg. (*Id.* ¶¶ 84–85.) The procedure lasted 18 minutes. (*Id.* ¶ 86.) On July 24, Taylor's wound culture collected at admission returned positive for MRSA. (*Id.* ¶ 87.) Taylor was discharged from St. Vincent's hospital on July 25. (*Id.* ¶ 88.) At discharge, Taylor was prescribed several antibiotics and Ibuprofen for pain. (*Id.* ¶ 90.)

In total, approximately 76 hours passed from the time Taylor submitted his first medical request to being sent to the emergency room. (BC PUF ¶ 73, ECF No. 64.) During that time, he was assessed by two HPL nurses, diagnosed with a skin infection, prescribed Keflex and Ibuprofen, and received the medications according to the instructions. (HPL PUF ¶¶ 57–60, 65, 69, 77–78, ECF No. 67.)

## II. SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson,* 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court reviews the evidence in a light most favorable to Taylor, the non-moving party; however, the Court will not accept conclusory allegations and pleadings if they are not supported by specific facts showing a genuine issue for trial. *Paul v. Theda Med. Ctr.,* 465 F.3d 790, 793–94 (7th Cir. 2006).

### III. ANALYSIS

### A. Eighth Amendment Claim

Taylor brings this action pursuant to 42 U.S.C. § 1983, which imposes liability on any "person" who, while acting under color of state law, deprives an individual of federally protected rights. County officers assigned to maintain custody of inmates serving sentences for crimes are clearly acting under color of law. *See United States v. Classic*, 313 U.S. 299, 326 (1941) (holding that use of power, possessed by virtue of state law and made possible only because the one is clothed with the authority of state law, is action taken "under color of state law"). Likewise, physicians and other health care workers who provide medical services to inmates in prisons and jails under contract with the state act under color of state law within the meaning of § 1983. *West v. Atkins*, 487 U.S. 42, 54 (1988). Thus, both the Brown County Defendants and the HPL nurses

working at the jail were acting under color of state law. The key issue is whether the defendants' actions or omissions violated Taylor's constitutional rights.

The Supreme Court has held that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05 (footnotes omitted). This does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. In the medical context, "an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind." *Id.* at 105–06. Thus, a complaint that health care professionals were negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. *Id.* at 106.

Ultimately, to prove a claim of deliberate indifference, "a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir. 2008) (internal citation omitted). To satisfy the objective element of the deliberate indifference test, a plaintiff must have a medical condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Edwards v. Snyder*, 478 F.3d 827 (7th Cir. 2007). An inmate's subjective belief that a different course of action would have been preferable does not constitute sufficient evidence of deliberate indifference to

survive summary judgment. *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005). In fact, even a difference of opinion between physicians is not enough to establish deliberate indifference. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Subjective knowledge of the risk is also required: "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan,* 511 U.S. 825, 838 (1994). Deliberate indifference requires more than negligence; it requires that the official knew of, yet disregarded, an excessive risk to the inmate's health or safety. *Id.* at 834–37.

Taylor contends that the skin infection, and related pain, he had from in July 2011 constituted serious medical needs. Taylor first noted the small bump on July 16, but he did not fill out a medical request or complain to an officer until July 18. (PPUF ¶¶ 1, 7, ECF No. 77.) Not surprisingly, Taylor focuses on his ultimate diagnosis of MRSA. (Pl. Resp. in Opp'n 4–7, ECF No. 75.) But this diagnosis was only tentatively made by a physician on July 21 when the emergency room "presumed MRSA," (Hospital Record, Decl. of Adam J. Freed, Ex. 7 at 2, ECF No. 69-7), and was not confirmed until July 24 by the results of the wound culture, (*id.* at 4). Taylor cannot backdate his MRSA diagnosis, which would be a serious medical need under any definition, to July 16, 18, or 20 to satisfy the objective element of the deliberate indifference test. The question is when it should have been obvious to the defendants that medical care, beyond what had already been provided, was needed.

In answering this question it is important to keep in mind that Taylor had been seen by a Nurse Nellis at 11:15am on July 20. Although Taylor contends she did not even examine his wound, he offers no evidence to suggest that Keflex, the antibiotic prescribed by Dr. Allen based

on Nurse Nellis' examination, was not medically appropriate treatment given his condition. In fact, the only evidence in the record is that the initial treatment provided Taylor was appropriate. (Decl. of David A. Paulson, M.D., Ex. 1 at 6, ECF No. 72-1.) Dr. Saletta, who treated Taylor and Dr. Paulson, the defendants' expert, both acknowledged that Keflex is commonly prescribed for skin infections and used as the first line of treatment. (HPL PUF ¶ 66, ECF No. 67.) Taylor was also given Ibuprofen for pain, hardly what one would expect from a person deliberately indifferent to Taylor's medical needs. Thus, any indifference that may have occurred must have occurred after Taylor saw Nurse Nellis on July 20 and before he was sent to the hospital on June 21. In addressing whether Taylor has adduced evidence of deliberate indifference during this relatively small window, I turn first to the conduct of Defendant HPL.

### 1. HPL

HPL was the corporation responsible for providing health care services at the WRC in July 2011 through a contract with Brown County. (HPL PUF ¶¶ 5–7, ECF No. 67.) Taylor has not named any of the members of the staff of HPL as defendants in this case or brought claims against members of the staff in their individual capacity. (*Id.* ¶ 10.) Instead, Taylor maintains that HPL is liable for the actions of its employees based on its supervisory role or as a result of some doctrine of vicarious liability. But while HPL may be liable for the negligence of its employees, it cannot be held liable for their violation of Taylor's constitutional rights for the simple reason that a plaintiff may not rely on the doctrine of *respondeat superior* in a § 1983 claim. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

Taylor briefly contends that HPL can be liable under the doctrine of *respondeat superior* because HPL is a private entity. (Pl. Resp in Opp'n 21, ECF No. 75.) His argument is not well

developed, however, and he cites to no authority, aside from *Monell* itself, supporting his position.

Moreover, this argument has been expressly rejected by the Seventh Circuit:

> We consider first the claim against the Wexford corporation itself. The question posed here is how § 1983 should be applied to a private corporation that has contracted to provide essential government services—in this case, health care for prisoners. The answer under controlling precedents of this court is clear. Such a private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Respondeat superior* liability does not apply to private corporations under § 1983. *E.g.*, *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982).

*Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). Thus, under the controlling precedent of this circuit, Taylor's only potentially viable claim against HPL, a private corporation providing health care for prisoners, would be for an unconstitutional policy or custom—a claim that Taylor expressly stated he does not pursue here. (Pl. Resp. in Opp'n 21, ECF No. 75.) Accordingly, HPL's motion for summary judgment will be granted.

Taylor does request, however, that the Court grant him leave to file a third amended complaint to add the individual nurses and doctors as defendants if he is not able to proceed against HPL directly. (*Id.* at 21–22.) He has not filed a motion for leave to amend or provided a proposed amended complaint as required by the federal and local rules. Fed. R. Civ. P. 15; Civil L.R. 15 (E.D. Wis.). Despite his failure to comply with the rules, Taylor argues that he should be granted leave because there is good cause for two reasons: (1) he did not know the identity of the individual defendants until after discovery and (2) he proceeded under the belief that HPL could be liable under *respondeat superior*. (Pl. Resp. in Opp'n 22, ECF No. 75.) He also contends that there would be no prejudice to the defendants for a variety of reasons. (*Id.*) He even suggests that the Court could still decide summary judgment as to the individual nurses and doctors in the present motion. (*Id.*) HPL strenuously opposes a third amended complaint, arguing that Taylor cannot show good cause

for filing another amended complaint well after the deadline for amended pleadings. (HPL Reply 3–15, ECF No. 83.)

Leave to amend should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). But a court may deny a motion to amend for undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment. *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Moreover, when a party seeks to amend the pleadings after the time for doing so has passed according to the court's scheduling order, a court is entitled to apply the heightened good-cause standard of Rule 16(b)(4). *Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011). "[A]mong the aims of Rule 16 are to prevent parties from delaying or procrastinating and to keep the case 'moving toward trial.'" *Id.* at 720.

Under any standard, Taylor's request to amend his complaint for a third time in response to a motion for summary judgment must be denied. Taylor's misunderstanding of the law regarding § 1983 and *respondeat superior* liability is not good cause. As *Shields* explains at length, the extension of the bar against *respondeat superior* liability from municipalities to private corporations is firmly entrenched in this area. 746 F.3d at 789–96. While Taylor may disagree with this rule of law, he cannot argue that it is was not well established years before Taylor filed his suit against HPL. *Id.* at 790 (noting that "a unified phalanx of decisions from our own and other circuits" extends the *Monell* shield to private corporations). Taylor's failure to research the viability of his legal theory against HPL at some point over the last two years is not sufficient cause to reopen the pleadings and delay this case further.

Taylor's asserted lack of knowledge of the identities of the individual nurses and doctors is belied by the record. At the latest, Taylor was aware of the identity of every HPL nurse and doctor who was involved in his care and treatment at the WRC by April 23, 2013, when HPL provided responses to his first set of interrogatories. (Answer of Def. HPL to Pl. First Set of Written Interrog, Supplemental Decl. of Adam J. Freed, Ex. 1, ECF No. 84-1.) This disclosure occurred nearly a week before Taylor filed his First Amended Complaint (ECF No. 23) and months before he filed his Second Amended Complaint (ECF No. 46). He was also sufficiently aware of the identities of the HPL staff to conduct depositions on July 29, 2013, of Nurses Nellis, DeGroot, and Klarkowski who provided care to Taylor at the WRC. (Aff. of Greg Babcock ¶¶ 3–4, ECF No. 76; Aff. of Timothy Johnson ¶ 13, ECF No. 65.) Even if Taylor was somehow not aware of the identities of the HPL staff before the depositions, he was certainly aware of them after. As a result, there is no doubt that Taylor could have included the individual nurses and doctors as named defendants in his Second Amended Complaint, which was filed months after these depositions occurred.

Another amended complaint would cause undue delay and prejudice. It would constitute a significant shift in legal theory, permitting Taylor the functional equivalent of a post-summary judgment "do-over" on the substance of his legal theory against HPL and its staff. While it would certainly be to Taylor's benefit to allow him to add claims against the HPL employees, the other defendants should not have to shoulder the increased costs and delays created by Taylor's delay. *Cf. Doe v. Howe Military School*, 227 F.3d 981, 990 (7th Cir. 2000) ("[P]leading is not like playing darts: a plaintiff can't keep throwing claims at the board until she gets one that hits the mark."). Nor can the Court simply pretend that Taylor had included the individual nurses and doctors for purposes of summary judgment and render a decision on the merits of the case against them. As HPL points

13

out, Dr. Allen would likely retain separate counsel because the nurses may assert that they relied on his orders in treating Taylor, at least as to the July 20 examination and treatment plan. Dr. Allen's counsel would need time to review the pleadings and discovery. Additional discovery, including a deposition of Dr. Allen and additional depositions of the nursing staff, would be likely. And, of course, another round of summary judgment motions would be necessary. Permitting Taylor to switch legal theories, to say nothing of the additional cost and delay, would constitute prejudice to HPL and the unnamed HPL staff. *See, e.g.*, *Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 773–74 (7th Cir. 1995) (affirming denial of leave to amend after close of discovery because more discovery would have been needed).

Finally, nothing in the record suggests any factual basis for a claim that the medical staff of HPL were deliberately indifferent to Taylor's medical needs. As noted above, Taylor has offered no evidence suggesting that the initial treatment provided him displayed indifference to his serious medical needs. Although he accuses Nurse Nellis of failing to examine the boil, notwithstanding the detailed description of it in her progress notes, Taylor has offered no evidence that closer examination would have mandated some other treatment. At most, Nurse Nellis may have been negligent for failing to appreciate the seriousness of his infection upon initial presentation; but if she was, HPL would bear liability for such negligence and there is no need to name her individually. *See, e.g., Lewis v. Physicians Ins. Co. of Wisconsin*, 2001 WI 60, ¶ 12, 243 Wis.2d 648, 627 N.W.2d 484 ("Indeed, in the present case, the hospital admitted that it could be held vicariously liable for the negligence of the two nurses under the doctrine of respondeat superior."). The same is true of Nurse Klarkowski, who denied Taylor's request to see a doctor on July 21 because he had seen the nurse the previous day and she thought it too soon for the antibiotic he was given to have had a

chance to work. Again, Nurse Klarkowski's decision to deny the request may be negligence due to her failure to appreciate the seriousness of Taylor's infection, but there is no evidence that it was deliberately indifferent. Even at this late date, Taylor has failed to offer any evidence of what the HPL employees did that could amount to deliberate indifference to his medical needs.

In sum, Taylor has not demonstrated good cause under Rule 16 or shown that grounds to grant a motion to amend even exist. Indeed, it appears from the record as it now stands that such an amendment would be futile. Accordingly, his 11th hour request to file an third amended complaint will be denied.

### 2. Captain Malcolmson

Turning to the Brown County Defendants, the claim against Captain Malcolmson falls for many of the reasons already discussed. Taylor does not maintain a claim against Captain Malcolmson in his official capacity or assert that he is liable as a policymaker under *Monell*. Instead, Taylor's claim turns on Captain Malcolmson's personal knowledge and actions. *See Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) ("Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise.")

Here, there is no evidence that Captain Malcolmson played any role in Taylor's medical care in July 2011 or at any other point for that matter. There is also no indication that he approved, condoned, or turned a blind eye to the alleged unconstitutional acts of the Brown County Defendants. *See Morfin v. City of E. Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003) ("[S]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable. . . . The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly

or with deliberate, reckless indifference." (internal quotation marks and citations omitted)).  In fact, so far as the Court can discern, Captain Malcolmson goes unmentioned in Taylor's brief and the discovery in the record.  Because there is no evidence that demonstrates that there is a genuine issue of material fact regarding Captain Malcolmson's personal involvement in, knowledge of, or willful blindness to the alleged misconduct by other defendants and he cannot be liable simply by virtue of his supervisory role, the claim against him fails as a matter of law.  Consequently, the Court will grant summary judgment in his favor.

### 3. C.O. Wotachek and Corporal Krings

Summary judgment in favor of C.O. Wotachek and Corporal Krings will be granted for a slightly different reason—their minimal involvement in Taylor's medical care does not demonstrate a sufficiently culpable state of mind.

Like Captain Malcolmson, C.O. Wotachek's name is conspicuously absent from Taylor's brief, his proposed facts, and the evidence submitted in opposition to the motions for summary judgment.  In fact, it is the supporting exhibits submitted by the Brown County Defendants and HPL that indicate C.O. Wotachek had some brief personal involvement in Taylor's medical care.  According to C.O. Wotachek's deposition, she was the officer that collected Taylor's first medical request slip and placed it in the HPL mailbox on the afternoon of July 18.  (Dep. of Jennifer Wotachek, Johnson Aff., Ex. F at 23:13–26:5, ECF No. 65-6.)  Even Taylor did not recall that he gave the medical slip to C.O. Wotachek.  (Dep. of Mark Taylor, Johnson Aff., Ex. J. at 33:3–12, ECF No. 65-10.)  This act—carrying the request from Taylor to the HPL mailbox—appears to be the sum total of her involvement.

Corporal Krings also had minimal involvement in Taylor's medical care. According to Taylor, he showed Corporal Krings his wound on July 18 after he worked his second shift in the kitchen and asked to go to the hospital. (PPUF ¶ 6, ECF No. 77; Taylor Dep., Johnson Aff., Ex. J at 37:18–25, 38:1–15, ECF No. 65-10.) Corporal Krings, for his part, does not remember denying Taylor's request or ever meeting Taylor for that matter. (Dep. of Alan Krings, Johnson Aff., Ex. I at 12:5–13, ECF No. 65-9.) Corporal Krings further argues that Taylor's recollection is incredible because Taylor testified that he made this request around 5:00pm on July 18 when Corporal Krings did not work during the evening from July 18 to July 21. (Brown Cnty. Reply 12, ECF No. 80.) For purposes of summary judgment, the Court will assume that Taylor did verbally complain to Corporal Krings at some point on July 18. Further, the Court will assume that Corporal Krings, as Taylor testified, "said he would see what he can do. He came back to our cell and informed me that I would have to go through HSU services." (Taylor Dep., Johnson Aff., Ex. J at 38:13–15, ECF No. 65-10.)

None of the conduct attributable to C.O. Wotachek and Corporal Krings demonstrates a sufficiently culpable state of mind. The necessity of surgery or other aggressive medical treatment on July 18 was not obvious even to the nurse who examined him two days later, and C.O. Wotachek and Corporal Krings, who are not medical professionals, had no way to know that Taylor's skin infection would eventually require it. *Higgins v. Corr. Med. Servs. of Illinois, Inc.*, 178 F.3d 508, 511 (7th Cir. 1999) ("To be deliberately indifferent a prison official 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" (quoting *Farmer*, 511 U.S. at 837)). They cannot be deliberately indifferent if they did not have any subjective knowledge of the nature of his skin infection.

17

They were, however, aware that Taylor was in pain, which can support a claim of deliberate indifference. *See Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997) ("[D]elays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims."). But they did not disregard his complaints, they reasonably responded to them. C.O. Wotachek took Taylor's medical request and placed it in the HPL mailbox, and Corporal Krings advised Taylor to submit a medical request slip because he did not deem it an emergency situation. In a situation in which it is not obvious that an inmate needs immediate medical assistance, their responses were reasonable and do not rise to the level of deliberate indifference. *See Greeno*, 414 F.3d at 656 ("Perhaps it would be a different matter if [the non-medical prison official] had ignored [the plaintiff's] complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address [the plaintiff's] concerns.") (citing *Hernandez v. Keane*, 341 F.3d 137, 148 (2d Cir. 2003); *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993)). Moreover, there is no evidence that suggests that C.O. Wotachek and Corporal Krings knew or even should have known that Taylor needed immediate medical attention. The undisputed facts suggest that they were correct, as Taylor does not recall making any complaints to anyone on July 19 and was able to work all of his shifts on July 18, 19, 20 and even 21. They are thus insulated from liability because they "responded reasonably" to Taylor's complaints. *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002) (quoting *Farmer*, 511 U.S. at 843). As a result, the Court will grant summary judgment in their favor.

### 4. C.O. Xiong

Like C.O. Wotachek and Corporal Krings, the evidence in the record demonstrates that C.O. Xiong had minimal contact with Taylor. According to Taylor's deposition, which is undisputed on

this point, he pushed the "ER button" in his cell at some point in the evening of July 21, 2011, requesting to be allowed to go to the hospital. (PPUF ¶ 21, ECF No. 77.) C.O. Xiong responded to the ER button and informed Taylor that he should make another request to HSU. (*Id.*) There is no evidence in the record establishing what Taylor told C.O. Xiong other than that Taylor wanted to go to the hospital.

C.O. Xiong's response to Taylor's complaint was reasonable based on the knowledge C.O. Xiong had at the time. By the evening of July 21, Taylor's infection had gotten worse. The undisputed facts demonstrate that it had increased in size and it is undisputed that it had "broken open" and was draining. Taylor had also submitted another request to HSU at some point on July 21, though the exact time is not clear. And Taylor had, of course, already been seen by Nurse Nellis on July 20 and prescribed an antibiotic and painkiller for the infection.

But there is no evidence in the record that C.O. Xiong was aware of any of this when Taylor requested that he be allowed to go to the hospital. C.O. Xiong, for his part, does not remember Taylor. (Dep. of Naotou Xiong, Johnson Aff., Ex. H at 4:11–20, 10:8–13, 13:6–17, ECF No. 65-8.) None of Taylor's deposition testimony, which is the only relevant evidence in the record, indicates that he provided any information to C.O. Xiong about the worsening condition of his leg or his pain level. (Taylor Dep., Johnson Aff., Ex. J. at 105:23–110:3, ECF No. 65-10.) The evidence establishes that C.O. Xiong answered the call, told Taylor that his request to go to the hospital had been denied, and advised Taylor that he would have to file another medical request form. This was a reasonable response to Taylor's complaint based on the information C.O. Xiong had at the time.

Moreover, C.O. Xiong was not responsible for administering medical care to Taylor; he was "entitled to defer to the judgment of jail health professionals so long as [he] did not ignore [the

prisoner]." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). The only exception to this rule is that nonmedical officers may be found deliberately indifferent if "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) (citations omitted). This rule supports the division of labor that is essential to effective prison management. *See Burks*, 555 F.3d at 595. Taylor does not present any evidence that C.O. Xiong was aware that Taylor was receiving improper treatment. C.O. Xiong was not trained to assess whether a course of treatment for a skin infection was adequate, and so he lacked the capacity to judge whether Taylor was improperly diagnosed and treated. Nor is there any evidence that C.O. Xiong saw Taylor's infection on July 21 from which he could have concluded that Taylor needed immediate medical attention—the only officers that Taylor remembers showing his leg on that day are Corporal Dequaine and C.O. Molitor. (BC PUF ¶ 82, ECF No. 64.). There is also no evidence that Taylor verbally described the condition of his skin infection or his level of pain to C.O. Xiong. As a result, he lacked the subjective knowledge to be deliberately indifferent.

Further, even if C.O. Xiong could have done more in response to Taylor's complaint—by going to visually inspect Taylor's leg, for example—the undisputed facts demonstrate that Taylor was seen by Nurse DeGroot on the evening of July 21 in any event. According to Nurse DeGroot's progress note, she saw Taylor around 6:00pm, conducted an examination, conferred with another nurse and Dr. Allen, and then allowed Taylor to go to the emergency room at St. Vincent's Hospital. (Medical Progress Notes, Decl. of Roxanne Klarkowski, Ex. 1 at 3, ECF No. 70-1.) Although it is not clear exactly what time Taylor complained to C.O. Xiong on July 21, it could not have been before 5:00pm because C.O. Xiong did not start his shift until 3:00pm (WRC Shift Schedule,

Babcock Aff., Ex. D, ECF No. 76-4) and Taylor worked in the kitchen from 3:00 to 5:00pm on July 21. (BC PUF ¶¶ 48, 51, 83, ECF No. 64; HPL PUF ¶ 82, ECF No. 67.) This one hour delay, which Taylor does not even allege to have worsened his condition, is insufficient to demonstrate that C.O. Xiong was deliberately indifferent, *see, e.g.*, *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009) (noting that delay of two and a half hours from injury to treatment was insufficient for deliberate indifference without evidence that delay worsened condition), even if C.O. Xiong was not entitled to rely on the professional medical judgment of the HPL staff. Consequently, the Court will grant summary judgment in his favor.

### 5. C.O. Molitor

Taylor's claim of deliberate indifference against C.O. Molitor fails as a matter of law not because she did not have sufficient knowledge of his pain or medical condition, but because she did more than any other individual to address his complaints. Indeed, C.O. Molitor should be commended for the initiative and concern with which she acted. She relayed Taylor's complaints and requests to go to the hospital to two corporals, she obtained additional medical supplies on multiple occasions for Taylor before he went to the hospital, and she sought out Nurse DeGroot on the evening of July 21 to see Taylor. Even Taylor recognized her efforts at his deposition:

> Emily Molitor, she helped me with dressings and bandages. This whole time they didn't even—they said they were going to give me Band-Aids. They didn't even give me Band-Aids. She would go down to HSU and get Band-Aids for me.
> . . . .
> She also talked to a third-shift corporal about my condition, and he—he told—she—she went on third shift, down to the corporal working, and asked if I could go to the ER. I specifically asked her to ask the corporal if I could see him. I said, Hey, Emily, this is getting so bad, would you please tell the corporal just to please come take a look at my leg, I just want to go to the ER. And she went  went down and when she told him my situation, he denied me, said some derogatory remarks, from what she said, and he gave me another HSU request to fill out, which I believe was the last one.

21

> . . . .
> Not directly from HSU, but [C.O. Molitor] went out of her way to get me some to
> bandage up my leg.

(Taylor Dep., Johnson Aff., Ex. J. at 64:6–11; 65:17–66:5; 66:23–25, ECF No. 65-10.)  He later

testified that she was the "only one" who got him bandages, and she did so approximately three

times.  (*Id.* at 135:8–23.)  While the time line of his requests and her responses is not entirely clear

from the depositions and the other evidence, C.O. Molitor worked third shift on July 19 and 20 and

second shift on July 21.  (WRC Shift Schedule, Babcock Aff., Ex. 4, ECF No. 76-4.)  Taylor cannot

point to a single complaint during those time periods that he made to C.O. Molitor that she did not

reasonably respond to.  She can hardly be deliberately indifferent because she attempted to obtain

but, in some instances, may have been unable to provide sufficient medical supplies because HPL

staff did not send them to the WRC.  She also cannot be deliberately indifferent because an

unidentified corporal denied his request, relayed by C.O. Molitor, to go to the hospital.  None of her

actions demonstrate the "equivalent of criminal recklessness" necessary to establish the subjective

inquiry under the Eighth Amendment.  *Borello v. Allison*, 446 F.3d 742, 747–48 (7th Cir. 2006)

("[T]he corrections officer must have acted with the equivalent of criminal recklessness.  Indeed,

an officer who actually knew of a substantial risk to a detainee's safety is free from liability, if [he]

responded reasonably to the risk, even if the harm ultimately was not averted, because in that case

it cannot be said that [he was] deliberately indifferent.  The test of deliberate indifference ensures

that the mere failure of the prison official to choose the best course of action does not amount to a

constitutional violation." (internal quotation marks and citations omitted)).  Based on the evidence

in the record, it is difficult to imagine what more C.O. Molitor could have done to come to Taylor's

aid.

Moreover, like C.O. Xiong, C.O. Molitor was "entitled to defer to the judgment of jail health professionals so long as [she] did not ignore [the prisoner]." *Berry*, 604 F.3d at 440. The evidence in the record demonstrates that she did not ignore Taylor: she obtained medical supplies and reported his requests to her superiors. And when she became concerned by the worsening condition of Taylor's skin infection, she (or Corporal Dequaine at her insistence) sought out Nurse DeGroot on the evening of July 21. Therefore, C.O. Molitor is entitled to summary judgment in her favor.

### 6. Corporal Donarski

The undisputed facts also demonstrate that Corporal Donarski's involvement in Taylor's health care was limited. Corporal Donarski's only involvement in the case was a denial of a request from Taylor, relayed by C.O. Molitor, to be allowed to go to the hospital on July 20. (PPUF ¶ 28, ECF No. 77.) Like the other non-medical personnel at the WRC, Corporal Donarski was "entitled to defer to the judgment of jail health professionals so long as [he] did not ignore [the prisoner]." *Berry*, 604 F.3d at 440. The evidence in the record demonstrates that he did not ignore Taylor's request, he denied it because he had been seen by HPL staff earlier that day. (PPUF ¶ 28, ECF No. 77.) He also directed C.O. Molitor to give Taylor a second medical request slip. (*Id.*) Taylor has presented no evidence that suggests that Corporal Donarski knew that Taylor had a serious medical condition and disregarded the risk it presented. He adhered to Taylor's treatment plan, Ibuprofen and Keflex, established earlier that day by a trained medical professional. (HPL PUF ¶ 69, ECF No. 67.) While Taylor argues that this treatment plan was inadequate for his condition, there is no evidentiary support for his position in the record. Dr. Charles W. Saletta, the physician who treated Taylor at St. Vincent's Hospital and appeared as an expert, offered no opinion on the care provided to Taylor at the WRC. (Dep. of Dr. Charles W. Saletta, Johnson Aff., Ex. N at 30:24–31:1–2, ECF

No. 65-14.) Even if the treatment plan was inadequate, Corporal Donarski did not have the training or experience to overrule the medical decision by HPL staff—a division of labor recognized as necessary for effective prison management. *See Burks*, 555 F.3d at 595. As a result, Corporal Donarski is entitled to summary judgment in his favor.

### 7. Corporal Dequaine

The evidence in the record establishes that Corporal Dequaine, like C.O. Xiong and Corporal Donarski, received just one complaint from Taylor, though he was aware that Taylor had made other requests on previous days. At some point on July 21, C.O. Molitor informed Corporal Dequaine that Taylor wanted to go to the hospital due to the "poor condition" of his leg. (PPUF ¶¶ 30, 91, ECF No. 77.) Corporal Dequaine denied Taylor's request to go to the hospital, advising that Taylor should make another medical request. (*Id.*) Again, by July 21, it is undisputed that Taylor's skin infection had worsened. (HPL PUF ¶¶ 71, 80, ECF No. 67.)

Corporal Dequaine's decision to deny Taylor's request to go to the hospital is not deliberate indifference. Like the other Brown County Defendants, he was "entitled to defer to the judgment of jail health professionals so long as [he] did not ignore [the prisoner]." *Berry*, 604 F.3d at 440. The only exception to this rule is that nonmedical officers may be found deliberately indifferent if "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Hayes*, 546 F.3d at 527. Here, Taylor had been seen on July 20 and prescribed a course of treatment. Then, in response to Taylor's second written request, Nurse Klarkowski denied it because he had been seen the prior day. According to Nurse Klarkowski, she denied his request because, in her medical judgment, the initial course of treatment needed additional time to work. (Klarkowski Decl. ¶ 49, ECF No. 70.) Corporal Dequaine did not

have the experience or knowledge to question that medical decision. (Expert Report from Dr. Chad Zawitz, Freed Decl., Ex. 9 at12–13, ECF No. 69-9.)

Further, even assuming that it would have been obvious to a lay person that Taylor needed additional medical treatment on the evening of July 21, the undisputed facts establish that Taylor received it. Nurse DeGroot saw him around 6:00pm and he was allowed to go to St. Vincent's Hospital. (Medical Progress Notes, Klarkowski Decl., Ex. 1 at 3, ECF No. 70-1.) As with the other Brown County Defendants, it is not clear when Corporal Dequaine learned of Taylor's condition and additional complaints on July 21, but it could not have been before 5:00pm based on his shift schedule and Taylor's work schedule in the kitchen. (WRC, Shift Schedule, Babcock Aff., Ex. D, ECF No. 76-4; BC PUF ¶¶ 48, 51, 83, ECF No. 64.)

This one hour delay, which Taylor does not even allege—much less come forward with supporting evidence—to have worsened his condition, is insufficient to demonstrate that Corporal Dequaine was deliberately indifferent, *see, e.g.*, *Knight*, 590 F.3d at 466, even if he should not have relied on the professional medical judgment of the HPL staff. Moreover, this medical judgment, according to HPL's expert, was not inadequate. (Expert Report of Dr. David A. Paulson, Decl. of David Paulson, Ex. 1 at 6–7, ECF No. 72-1.) Taylor has come forward with no contrary evidence, as Taylor's expert did not have an opinion on the treatment Taylor received from the HPL staff. (Saletta Dep., Johnson Aff., Ex. N at 30:24–31:1–2, ECF No. 65-14.)

The undisputed facts further show that this one hour delay was not significant. To put the one hour delay into perspective, Taylor was admitted St. Vincent's Hospital on the evening of July 21 where the emergency room physician diagnosed Taylor as having cellulitis and "presumed" MRSA. Dr. Saletta did not perform the 18-minute surgical procedure until just before 9:00am on

July 22.  (*Id.* at 15:12–16:22.)  While MRSA is obviously a serious medical condition that needs aggressive treatment, Taylor's condition was not so serious that immediate surgical intervention was necessary.  Instead, the hospital felt comfortable waiting more than 12 hours.  Consequently, the Court will grant summary judgment in Corporal Dequaine's favor.

## B.  Remaining Claims

Taylor also asserted claims under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  He concedes, however, that they add nothing to his Eighth Amendment claim of deliberate indifference, and thus those claims will be dismissed.  Because none of the defendants violated Taylor's constitutional rights there is not need to address their alternative arguments that they acted in good faith and are therefore immune from liability.  What remains are Taylor's state law negligence claims against the defendants and the County's insurer.  This Court had supplemental jurisdiction over Taylor's state law claims because they were "related" to the Eighth Amendment claims and the claims formed "part of the same case or controversy under Article III."  28 U.S.C. § 1367(a).  Having dismissed Taylor's federal claims, the Court must now decide whether to retain jurisdiction over the remaining state law claims.

Retention of the state law claims is contrary to the usual practice.  Under 28 U.S.C. § 1367(c), district courts may decline to exercise supplemental jurisdiction over state law claims once all the federal claims have dropped out.  Retaining jurisdiction over the state law claims when all of the federal claims have dropped out is a "purely discretionary" decision.  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary.").  The Seventh Circuit has described a "sensible presumption that if the federal

claims drop out *before trial*, the district court should relinquish jurisdiction over the state-law claims." *Williams Electronics Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007) (emphasis in original). Nothing in this case suggests that this presumption should be ignored. Accordingly, the state law claims will be dismissed without prejudice.

## IV. CONCLUSION

Accordingly, and for the reasons set forth above, Defendants' motions for summary judgment are **GRANTED**. Plaintiff's § 1983 claims against the defendants are dismissed with prejudice. Plaintiff's remaining state law claims are **DISMISSED** without prejudice. The Brown County Defendants also filed a motion to exclude the opinion testimony of Plaintiff's expert Gary M. Peterson pursuant to *Daubert v. v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993). Plaintiff agreed that the Court should render its decision on the pending summary judgment motions without considering Peterson's opinion and only decide the motion to exclude his expert testimony if the summary judgment motion was denied. Based on the Court's decision on the summary judgment motions, the motion to exclude is denied as moot.

Dated this ___19th___ day of August, 2014.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court